Good morning, ladies and gentlemen. We have six cases on the calendar this morning, two from district courts, two from the Patent Office, and one each from the Court of International Trade and the Merit Systems Protection Board. The last one and the one from the district court are being submitted on the briefs and will not be argued. Our first argued case is Roland Corporation v. inMusic Brands, 2023, 1327, 1401, 1564, and 1565. Mr. Scott. This conference is now being recorded. If you have any objections, you may disconnect at this time. Good morning, may it please the court. I'd like to begin with damages. The district court expressly relinquished its gatekeeping role under Daubert in 702 and impermissibly let the jury decide the reliability and sufficiency of expert testimony. There is no subtlety here. The district court included on the damages verdict form over both parties' objections a question for the jury to determine whether Roland proved that its damages witnesses, its damages expert witness, quote, had sufficient credible information to render her opinions, unquote. This abdication of the district court's gatekeeping function is especially important in the context of damages to ensure awards are properly apportioned and conform to legal principles. So let me just pivot to the lost profits damages testimony at trial. In the first instance, the district court decides the availability of lost profits. That too is not done here. Only after the district court determines as a matter of law that lost profits are available does the jury get to determine the amounts of lost profits. So there's two components. Did you object to Ms. Hindman before she testified? Yes, your honor. We filed a motion pre-trial under Daubert and the magistrate judge and decision adopted by the district court judge said it was dubious that Roland would be able to put forward the factual predicate and the opinion testimony necessary to support an inexorable flow theory of recovery, but she let it go to trial. It went to trial in part because Roland said that its principal witness and Mr. Tremora is going to provide the next, the necessary factual predicate for Ms. Hindman's testimony, but he never did. And Ms. Hindman, in fact, at trial disclaimed that she was offering an opinion as to an a step. It's the jurisprudence of this court doesn't even acknowledge that an inexorable flow is a cognizable theory of recovery in a damages case. The Warsaw orthopedics case, Judge Lori and Judge Justice Reyna, your decision indicates that a patentee may not claim that its own damages the lost profits of a related company. So Roland is expert, not only disclaimed any opinion, whether Roland U.S. profits for an actually flow to Roland, but at trial, there was no evidence supporting it whatsoever. Roland in its red brief relies on essentially one line of testimony from Mr. Tremora that Roland U.S. profit will be returned to Roland in the form of dividends. So even if inexorable flow is a recognized theory of recovery under this court's jurisprudence, there was no there there at trial. The predicate factual information was not there. It wasn't through their expert witness. It wasn't through their fact witness. Counsel, does it matter here that Roland U.S.A. is a wholly owned subsidiary of Roland? It doesn't, your honor. In fact, in the Mars versus coin acceptors case, that fact alone does not is not sufficient to establish an actual flow. Do you think that would create an assumption, a presumption that that what we have is inexorable flow if we have a parent U.S. organization scheme? No, your honor. In fact, Mars versus coin acceptor stands to the proposition that just because there's a wholly owned subsidiary or a subsidiary who's a non-exclusive licensee, that alone cannot satisfy that there is an actual flow, a theory that has never been recognized by this court. And essentially the policy behind it, if I may, is that you have these corporate structures set up for tax benefits and for other structural reasons, and you take the burden with it. And then one of the burdens in this situation is that they don't get the benefit of an actual flow. So there is no evidence there, not even to change or establish that an actual flow is a recoverable form of damages here. But even for word, there's nothing there in the record to support it. The other aspect of their damages theory was under Panduit as a lost profits. And we targeted in our briefing, Panduit's two and four. And here too, Roland falls short of meeting its proof. Roland under Panduit two must prove consumers were motivated to purchase the accused products because of the mesh drumheads. The availability in the first instance of lost profits, again, is a matter of law in the Calico case. And the district judge never made that initial determination. And the evidence to trial established that non-mesh drumheads sold by Yamaha, a company called Cat, in music among other companies would have captured sales and in fact capture sales while Roland meshheads were available. So they don't satisfy Panduit two. And Roland's alternative argument that Ms. Heineman, their damages expert, accounted for non-mesh drumheads in the marketplace is completely unsupported. She never testified that her price elasticity calculation accounted for the existence of non-mesh drumheads in the market. And she calculated her damages or premised her damages as if Roland and InMusic's prices were equal, which they were not for the most part. And that Roland would have captured 99% of InMusic sales. And when you look at her testimony, there's nothing there to support that. I'm sorry, did your side cross-examine Ms. Heineman about this to try to explore the details of her theory on price elasticity of demand in arriving at a certain number of sales that Roland would have enjoyed if InMusic hadn't infringed? We did cross-examine, Your Honor. But did you explore this in any detail? I mean, we have Federal Rule of Evidence 705, which says that experts don't necessarily have to go through the nitty-gritty of every single piece of data and fact that they rely on for their opinion. And a lot of that can be explored through cross-examination. I mean, it says that right in the rule. So I'm just trying to figure out to what extent did your side fulfill what appears to be straight out of the rule, an to ferret out some of this underlying fact? So I think the 705 is just half of the equation, Your Honor. The other half of the equation is the big leisure line of cases. And that is that 705 does not excuse the party with the burden of proof to provide the factual predicate to meet the appropriate standard. And that here is that Roland bared the burden of proof of a causal connection between the infringement and the alleged lost profit. That's what they never did. And if I can provide a rough analogy, this is a faulting InMusic who's a batter from not swinging at a pitch that was never thrown. Roland never put forward the necessary factual predicate through either Ms. Heinemann or any of their fact witnesses. And 705 doesn't apply to the fact witnesses. And so we couldn't meet evidence that was never offered. It wasn't our burden to put in evidence and then dispute it or cross-examine on evidence that Roland never provided. So we did satisfy our obligation under 705. And in particular, in the next full flow, as I indicated, Ms. Heinemann testified that she disclaimed that she was offering an opinion on that wasn't a basis for us to cross-examine. I'd like to just go to a reasonable loyalty unless there are other questions on lost profit. Please proceed. Okay. So on the reasonable loyalty component, this too suffers from a deficiency of evidence. Their expert, Ms. Heinemann, in that context, denied that licenses need to be technically and economically comparable to be probative of a royalty rate. And she does that at Appendix 2853 and it's set forth in our yellow brief at 31. But on the drums, for example, the hypothetical license would only involve the 458 and the 535 PAC. And she puts up some licenses, including the PINTEC licenses, which was 10 years before the hypothetical negotiation. I'm sorry, 10 years after the hypothetical negotiation or the HART license, which was 12 years before the hypothetical negotiation date. Any of the underlying documents were never put forward in evidence, notwithstanding the fact that some of the financial information may have been on their trial exhibit list. They put forward a license from Guitar Center that Guitar Center rejected. They enrolled and proposed a license about a 50% premium for a double-mesh head. Guitar Center rejected that license. So under the Witserv and Omega lineup cases, a patentee's offers are not probative of what a reasonable or comparable license is. So the other fault in Ms. Heinemann's kind of abridged testimony is that she never apportioned for the patents that were no longer at issue in this case. And she never apportioned for the non-patented features, such as the sound modules that contributed to consumer demand. When it comes to the damages portion of this trial, how long did it go on for? Was it like a two-hour trial just devoted to damages? Yeah, at most. I mean, the district court limited the damages testimony to 20 minutes or so. It went on longer than that, but that was limited in large part to accommodate the vacation schedule of Ms. Heinemann. And also one of the jurors, correct? And also one of the jurors, that's correct, Your Honor. But there was nothing there for, there was no impediment for Roland to put on an offer of proof if it felt that its evidence was somehow deficient. And it never did that. Instead, it comes to this court and argues that inexorable flow either as a lost profit remedy or the Pandora factor support the jury verdict. And the same thing happened on the symbols side, on the reasonable royalty side. So that was blended between drums and symbols. There's no way to unscramble those eggs. They're not apportioned in any way. And the symbol licenses were also not comparable, particularly on economic comparability. You know, there was no go forward licenses. There were zero licenses, things of that nature. Counsel, we've run to your rebuttal time. You can continue or save it as you wish. I'll reserve for rebuttal. Thank you, Your Honor. Thank you. Mr. Kelly. Good morning, Your Honors. May it please the court. Just so I don't forget one minor point Mr. Scott made towards the end of his soliloquy. It is not correct that Ms. Heineman's testimony was limited to 20 minutes to accommodate her vacation. It is true that earlier in the case, we asked that Ms. Heineman's schedule be accommodated. But by the time the damages trial came up, the judge was singularly focused on getting that trial done before Thanksgiving. We told him at the time Ms. Heineman had changed her schedule, she would be available for an and we asked twice that she be allowed to give her complete testimony. Nevertheless, the judge limited her testimony to 20 minutes. They got a lot longer than 20 minutes to cross-examine her. In that 20 minutes, she laid out all she needed to lay out both on lost profits and on reasonable royalties. And as we just heard Mr. Scott do today, she was cross-examined. They asked her about the licenses. They asked her about the comparability. She did not say, as Mr. Scott just said, that she thinks all licenses can be used. She said that licenses have the value they have based on what's in them and that she tried to find licenses that were technologically close, that were temporarily close. She did the best she could with what she had. She's a professional. She laid it all out in exhaustive expert opinions that they had before trial. They were able to go through them. And as we know, they were able to cross-examine her. And that's why we have a trial. It's not correct that there was no evidence. There's plenty of evidence. Well, could we just go straight to first the inexorable flow theory? Sure. And as the other side pointed out, all you have is a single sentence from Mr. Tamura testifying that because Roland US is 100% subsidiary, all profits go to Roland, Roland Japan. And that single statement without anything more seems to run into the teeth of our Mars opinion, where on very similar facts, we said, you just can't have a witness say that because of a parent subsidiary relationship, you get all this inexorable flow of lost profits of the subsidiary that you need to have some record evidence that shows that the parent is in fact receiving those profits from the subsidiary. And the subsidiary therefore is nothing more than a pass-through. And so I don't understand how we can sustain the inexorable flow loss profits here in the face of Mars. So to start with your honor, the inexorable flow portion of the lost profits is only half of the lost profits. And I just want to get that out there at the outset, unlike Mars or cases like right height or poly America. This is not a case where the plaintiff Roland is not selling the patented product. It absolutely was. Roland was selling the product to its wholly owned subsidiary Roland US and much of Ms. Heineman's lost profits data were related to the profits that Roland lost for the sales that Roland actually lost. So in that sense, it's just a standard vanilla lost profits case. Now the component of the lost profits that's related to the profits of Roland US. Yes, I understand that is similar to the Mars situation, but there's no doubt that the drums, the same drums that Roland sold to Roland US were then the drums for which the sales were lost due to the infringement. So the only question is what happened to those profits and your honor's correct. There's no documentary evidence about where those profits went, but we have the testimony of the Roland executive that explains it's a wholly owned subsidiary, all of the profits. And this is addition to being a wholly owned subsidiary. He testified as an executive of the company that all of the lost profits, or I'm sorry, all of the profits blow up to Roland Japan, the plaintiff in this case. So anything and everything Roland US sells, whatever profits Roland US gets, Roland US just hands all of it over, whether it's a symbol, a drum or a drumstick, anything else? Yes, that was his testimony. That's how the companies are arranged. So all of Roland US's losses and revenue and costs, they all go, they're all put on Roland Japan's accounting books? Yes, everything. It's a wholly owned subsidiary and all the dividends are passed up. And then Roland, and I think InMusic discusses this in their briefing, Roland then decides what to do with the profits once Roland has them. So once the profits are pushed up, Roland, the Japanese company, the plaintiff here decides how those profits are apportioned and makes the business decisions that I think your honor was just referring to. Do they all show up on the corporate consolidated financial statement? Your honor, I don't know what shows up in the Japanese statements. I'm just not aware of that. I know that the testimony in this case was that all of the profits go up. That's the testimony that was needed and they were able to elicit cross-examination of that witness and they were also able to depose him. They go up in fact or could go up? Go up in fact, that was his testimony that all the profits go up as dividends, 100%. So Roland US, when it reports out how much profits it made, does it always say zero? We made no profits because we don't have any profits because any profits we have, they go all the way up to Roland Japan. Your honor, so I am not a corporate lawyer. So just to get that out there, these are not like publicly traded corporations. This is a privately held company and as I think Mr. Scott raised in InMusic's brief. And so I can't speak to what is beyond the evidence in this case. I can tell you that there was testimony in front of the jury that it's 100% owned subsidiary and that all of its profits are passed up in the form of dividends. That was the testimony and that's sufficient to move that amount of profits to roll in the plane of fear. But even were there a doubt on that, your honor, all that means is that that chunk of profits from Roland US should not be put together within the lost profits part of the damages. And in fact, Ms. Heineman testified about the $1.35 million, which would be attributable to Roland's profits itself. And so when it came to this price elasticity of demand theory, where I believe Ms. Heineman said something about, well, Roland would have received 4,000 of those infringing sales that InMusic had done. Does she have the details of that theory in her expert report? Can we look at the expert report and see where she got the 4,000 number, where she got the underlying number of 13,000 InMusic infringing sales? Your honor, InMusic absolutely had her full expert report and she explained how she used the price elasticity of demand. It is not in the record before this court, the full expert report did not come in. But InMusic certainly had the ability to look at the details of her analysis and could have cross-examined her on those details. So when you say it didn't make it into the record, are you saying that if we ordered the full record, we wouldn't be able to see this part of Ms. Heineman's expert report with the price elasticity theory? I believe that's correct, but yeah, expert reports don't come into evidence, your honor. So the expert report here is not in evidence. They see the expert report so they can object if she testifies to something that's beyond the report and so that they can fully cross-examine her on the basis. But what gets into the record is things admitted at trial for the purposes of the jury's decision and for the purposes of this appeal. So you would not see that detail if you ordered the full record. One more point, sorry. When it comes to the royalty licenses, it seems like there was a lack of accounting of patents in those licenses that were not part of the trial. And so I thought it was fairly established now that when you are trying to use a so-called comparable license, you need to account for patents that were included in the license that are not included in the infringement question in a litigation. And so that's one concern. Another concern is that for the Pintech license, I believe Ms. Heinemann calculated that that license was valued at about $9.50 per unit, but then she somehow converted that into something about $12.50 without any rhyme or reason. And then the Hart license also seems to have some problems because she calls out that that was $16 per unit, but that included replacement parts. And she said all of these licenses were valued at $12 to $14 per unit, but we have a $9 one with Pintech and we have a $16 one with Hart. And so there's multiple questions that I have or concerns that I have, as well as the alleged 50% premium for double mesh drums when nobody had ever accepted a 50% premium for double mesh drums. So I guess the concern I have is that there's a cascade of issues here running shot through the royalty damages case that makes me how we could actually sustain it. So Your Honor, let me start at your last question. It's true that there are no licenses for the double mesh drum kit and that's because it was never licensed. Roland is the only entity that's able to sell those products in the United States due to its patents. And so as was brought out on cross-examination, Ms. Heinemann used the best licenses she could, closest that she could to this subject matter. Now for the Pintech license, Your Honor pointed out the two different dollar amounts. That's because the Pintech license was litigation driven and it was a 10% license. It was 10%. And so the parties disagreed about where that number came to. That's why there's two separate numbers. Roland understood the 10% to be $12 and 66 and Pintech, obviously the lower number, but that's why there's two for that, because it was a percentage license. Yes, there was a spread of licenses and none of them were for the dual layer mesh drum because Roland chose never to license that to anybody. It tried to license it to Guitar Center and Guitar Center was its very biggest customer. And so it was licensing with a party it wanted to do good business with and it offered to license it for a 50% premium over and above what would have charged for a single layer mesh drum. And so that's the best evidence of how parties would have negotiated a license up from the cost for the license for the single layer. First of all, Guitar rejected that premium offer, right? There was never a license. That's correct, Your Honor. And the Guitar license for the single mesh drums was $12 per unit. Is that right? Yes. So then if Guitar had accepted the 50% premium, that would have been an $18 per unit license, not a $20 per unit license, which was in fact what Ms. Heinemann was calling for and the jury apparently adopted. Well, the Guitar Center license, Your Honor, was a license made by two parties dealing at arm's length together and not a license that would have been made by an infringer. So yes, our biggest customer, we gave them good terms. That's why Ms. Heinemann looked at other licenses, the license for $17, for example. I'm about out of time and if I could just pivot to the pre-judgment interest. Could I just ask one quick question? And I do want to hear what you have to say about pre-judgment interest vis-a-vis equitable estoppel. But what do you think is the principle of when we decide, when we think there is a defective damages award, when we should order a new trial on damages versus just that reverse on the J-Mall and say no damages? Well, Your Honor, it obviously would be case by case. In this case, a new trial would absolutely be required. And that's because of the 20-minute total testimony that Judge Moreno cabined Ms. Heinemann to. Her expert reports about what she could have testified to anything were exhaustive. And we asked that her full testimony be drawn out in front of the jury. We were not permitted to do that. It would be remarkably unfair if this court had some sort of concern with her testimony at trial to just throw away the damages when in fact she was handcuffed and how much she was permitted to say. So in a case like this, I don't see how you could possibly just throw the damages out without ordering a new trial. But Your Honor, everything Your Honor went through in questioning me about the licenses, about their applicability, about their dollar amounts, all of that was in front of the jury. And it's a question of fact. And it was a question for the jury. And the jury decided it here. About pre-judgment interest, it's provided for under Section 284. It's the rule. It's not the exception. And in objecting to pre-judgment interest before the district court in Muzik said it would be a windfall for us. They had it exactly backwards. The lack of pre-judgment interest is a windfall for them because without pre-judgment interest, we, the patentee, are not placed in the position we would have been absent their infringement. The court said they were prejudiced by delay. Your Honor, the court did discuss the delay. But the problem is, the delay just ended up making there be more damages to the extent there was a delay. So yes, because they didn't get sued, perhaps they made more and more of these things. But the problem is for the purposes of this inquiry, you have to figure out what would happen in the alternate universe. What would have happened had we sued? What would happen had we put them in the notice back when they say that they weren't put on notice? And what the judge said is, well, maybe they could have done something else. They could have redesigned. They could have changed their symbols. But the problem is, under this court's Kauffman decision, the district court judge had to make a decision about what they would have done, that they would have redesigned. And we know that they wouldn't have because when they were sued, they didn't redesign. So the fact that they were continuing to infringe does not excuse the fact that they have to pay prejudgment interest. Thank you, Mr. Kelly. Mr. Scott, we'll give you four minutes for rebuttal. Thank you, Your Honor. Let me just start where Mr. Kelly left off on that could-would dichotomy. The best evidence of what InMusic could or would have done is what they did in 2011. When Roland's lawyer reached out to InMusic and said, we have a problem with your electronic symbols. These are the two problems we have. Those symbols were manufactured by a company called Medeli. Medeli redesigned those symbols to satisfy those two objections raised by Roland. It did it in 2011 for not only InMusic, but the other companies that it supplied. Pearl is another one, and Fender is another one. So InMusic, in fact, as Pearl and Fender did, did make a change to the symbol design to accommodate the issues raised by Roland's lawyers. That's what the judge found. And that is what- Did the judge say all of this in its decision on no prejudgment interest? I don't think-I don't think he did. No, but Your Honor, Judge Shen, you referenced a few moments ago the decision on equitable estoppel, which was combined with the decision on inequitable conduct. And those findings of fact in the equitable estoppel decision support everything that I just laid out, that InMusic reasonably relied on Roland's silence when it redesigned the symbols in 2011, publicly sold them. Roland reviewed its products at trade shows, its advertisements, things of that nature. This was no surprise to Roland. And InMusic expanded its product line. Those were findings of fact by the district court judge. Wait a second. I don't-where are those findings of fact by the district court judge? In the no equitable estoppel ruling, he ruled against you. He found that, no, there was no prejudice against the defendant through some silence or other conduct by Roland that would somehow mislead you to think that you would never be sued on the redesigned symbols. Right. But he made those findings and the decision denying prejudgment interest. And that equitable estoppel decision- Well, that's what I'm asking. I don't recall him making-telling the story that you're telling now in his ruling on no prejudgment interest. It seemed pretty conclusory. He seemed to suggest that Roland knew about your redesigned symbols. And I don't know how he made that finding, how he could have made that finding, because he didn't point to anything that would prove that up in the order. And it also conflicts with his actual analysis in the equitable estoppel ruling, where he found that your side had not met your burden of proving that the conversation between the two parties showed that Roland knew all about your redesigned symbols and made some kind of indication that it wasn't going to sue in music for those redesigned symbols. So there's a couple of things here. So in the prejudgment interest, the court did determine that there was a years-long delay in Roland asserting it's right. And it's not Roland's knowledge. It's whether in music reasonably relied. And it's a challenge. But getting back to the idea of, I guess, what Mr. Kelly was saying is, do we have a finding or analysis of what in music would have done if it had been sued earlier or been threatened with suit earlier? I mean, that seems to be a little bit missing right now. I don't think it's missing, Your Honor, because there is record evidence as to exactly what in music did in 2010 and 2011 in response to Roland's complaints. And Section 284 does not mandate prejudgment interest, as Mr. Kelly indicated. It just doesn't. The district court may limit or deny prejudgment interest where the patentee was responsible for undue delay in prosecuting the lawsuit. And that is the explicit finding of the district court judge. And as to the remedy that we're seeking here, whether it's a new trial or Jamal in our favor, we didn't get to the liability side. But on the damages side, the responses Jamal should issue in favor of in music. Roland had an opportunity to put on its case, and it failed to do so. Your time has expired, and we'll have to stop the music. Thank you for both counsel. The case is submitted.